CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

NOV 1 2 2014

JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

STEVEN FERRELL,             )

Plaintiff,           )     Civil Action No.: 5:13cv00075

v.           )

GREAT EASTERN RESORT       )     By: Hon. Michael F. Urbanski
CORPORATION, INC., et al.,     )        United States District Judge

Defendants.         )

## MEMORANDUM OPINION

This matter is before the court on defendant Great Eastern Resort Corporation, Inc.'s ("Great Eastern")[1] motion for summary judgment, Dkt. No. 78, and plaintiff Steven Ferrell's ("Ferrell") motion for partial summary judgment, Dkt. No. 80. Ferrell alleges that Great Eastern, his former employer, unlawfully retaliated against him for filing a charge of sexual harassment with the Equal Employment Opportunity Commission ("EEOC") in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3. Am. Compl., Dkt. No. 45, at ¶ 1. For the reasons stated herein, the court will **GRANT** defendant's motion for summary judgment and **DENY** Ferrell's motion for partial summary judgment.

I.

Great Eastern developed Massanutten resort ("Massanutten"), a 6,000 acre time-share resort located in Rockingham County, Virginia. Great Eastern built and developed the time-shares at the

---

[1] Great Eastern Resorts Management, Inc., and The Resorts Companies, Inc., were terminated as defendants on December 10, 2013.

1

resort, but the Berkley Group, Inc., a Fort Lauderdale, Florida, based company, manages marketing and sales activities for Massanutten. Hierholzer Decl., Dkt. No. 78-1, at ¶¶ 2-4.

Great Eastern sells time-shares utilizing sales employees on two distinct sales teams. The "front line" sells to first time buyers, and the "in-house line" sells to existing time-share owners. Def.'s Mem. Supp. Summ. J., Dkt. No. 79, at *4. The front line and in-house line have different work schedules, give different types of tours, and their offices are located in different areas on the Massanutten property. Id.; Sprouse Dep. at 67:12-15. The hierarchy of the sales staff at Great Eastern consists of the project director, line directors, sales managers or "take-over" managers ("TO manager"), and sales representatives. The project director oversees all sales operations at Massanutten, the line directors oversee the TO managers who, in turn, oversee teams of sales representatives. The sales representatives are the first point of contact for customers at Massanutten. Clevenger Aff., Dkt. No. 78-4, at ¶ 3.

Typically, the front line sales representatives arrive at the resort each morning and wait for guests to arrive for tours of the property. The representatives are chosen to give tours on a rotational basis. After a tour of the property and its facilities, the representatives bring the customer back to the resort and try to convince the customer to commit to purchasing a time-share. At this point, a TO manager assists with the transaction and tries to close the sale. Ferrell Dep. at 36:11-38:12, 41:2-17. The customer either refuses to buy, makes a "full-down" purchase by paying at least ten percent of the purchase price up front, or makes a "pender" purchase where he commits to pay at least ten percent of the purchase price over a period of time. Sprouse Dep. at 41:10-42:25. TO managers also give at least one tour each day. Kent Dep. at 22:13-22. TO managers may close their own deals without the assistance of another TO manager if their sales numbers are a certain level for the preceding six months. Id. at 29:5-10; Bradley Dep. at 48:11-15. If a TO manager closes a deal on his own but does not have the requisite six-month sales level, another TO manager will have to sign

2

off on the deal before it can be submitted. In that case, the second TO manager will receive the TO commission for that sale. Id. at 30:3-31:21.

Sales representatives are evaluated based on a performance metric known as volume per guest ("VPG"). The VPG calculation is straightforward: the total sales revenue generated by a representative divided by the total number of customers that representative toured in a given period. Managers look at VPG over periods of time ranging from thirty or sixty days, to six months, to one year. Id. at 14:19-16:9. A person's VPG can differ over those various time frames depending on if he hit a slump, went on a hot streak, if a customer changed his mind and cancelled a purchase after leaving the resort, or if a customer failed to complete a down payment on a pender sale. Ferrell Dep. at 290:9-25; Sprouse Dep. at 39:5-13, 44:11-16. VPG reports can include only "full down" sales for the sales representatives or "full down plus penders." Sprouse Dep. at 44:17-25; Ferrell Dep. at 227:23-228:11; Bradley Dep. Ex. 12. TO managers are evaluated based on two metrics: their VPG measures their sales performance, and their "TO numbers" track their performance as managers— mainly their ability to finalize sales. Clevenger Aff. At ¶ 5; Bradley Dep. at 47:1-16.

Great Eastern seasonally reduces its sales force to coincide with declines in tourism. Ferrell Dep. at 51:8-52:13; Kent Dep. at 59:14-21. In order to determine how many members of the sales team to retain, the project director relies on the marketing department's predicted customer flow and recommendation on the number of sales staff needed. Kent Dep. at 60:11-61:7. The project director will then rank the sales staff based on their VPG and terminate or transfer those sales representatives ranked below the number of representatives needed. Kent Dep. at 61:9-62:9.

Ferrell began working for Great Eastern as a front line sales representative in 2003. Ferrell Dep. at 45:4-10. He was promoted to TO manager in 2005, demoted to sales representative in 2007, promoted to sales manager a month later, demoted to sales representative again the following month, transferred to the exit department a few months later, transferred back to sales as a TO

3

manager in 2008, demoted once again to sales representative the following month, and then
terminated in November 2008. Ferrell Dep. at 45:15-48:12; Ferrell Dep. Ex. 4. The November 2008
termination was part of a seasonal reduction and was based on Ferrell's poor sales numbers.
Clevenger Aff. at ¶ 8; Kent Dep. at 16:16-21. Great Eastern rehired Ferrell in 2009 as a sales
representative, and Victor Buckley was his line director. Ferrell Dep. at 48:20-49:1; Ferrell Dep. Ex.
4. Ferrell was promoted to TO manager again in 2011. Ferrell Dep. at 49:14-16; Ferrell Dep. Ex. 4.
In February 2012, Ferrell was transferred to a different line director, Rebecca Bradley, after having
problems working with Buckley. Bradley Dep. at 17:20-18:9; Ferrell Dep. Ex. 4, Ex. 16 at *GERC
632; Kent Dep. at 34:16-35:22.

   In 2012, Bob Kent ("Kent") and Steve Nichols ("Nichols") were co-project directors for the
resort's sales division, and Rebecca Bradley ("Bradley") was Ferrell's line director. Clevenger Dep. at
22:14-19; Kent Dep. at 34:16-19. Ferrell was a TO manager on Bradley's line. Ferrell Dep. at 49:14-
19. In late July or early August 2012, Bob Kent asked Bradley to select one of her TO managers to
demote and to base her decision on either TO numbers, "team numbers", or personal VPG. Bradley
Dep. at 64:4-15; Kent Dep. 48:12-22.  Bradley recommended that Ferrell should be demoted
because he had the lowest TO numbers among Bradley's team of TO managers and because of
"how much volume he had, and how many tables he had sat on." Bradley Dep. at 65:10-16;
Clevenger Dep. at 151:3-11. The final decision to demote Ferrell was Kent's responsibility. Kent
Dep. at 48:4-11. Despite his demotion to sales representative, Ferrell continued to close some of his
deals without the assistance of a TO manager. Id. at 28:10-29:10; Ferrell Dep. at 49:25-50:12.

   Other TO managers were demoted from other lines as well.  Those TO managers not only
had the lowest TO numbers among the TO managers on their respective teams, but they also had
the lowest personal VPG numbers as well. Clevenger Dep. at 152:24-153:6. On Bradley's line,
however, there was not a TO manager who had both the lowest TO numbers and the lowest

4

personal VPG. Ferrell had the lowest TO numbers, but Steve Morrin ("Morrin") had the lowest personal VPG. Id. at 153:7-21.

After his demotion in August, Ferrell filed a complaint with David Clevenger ("Clevenger"), Great Eastern's human resources director at Massanutten. In that complaint, Ferrell alleged he was wrongfully demoted based on a romantic relationship between his supervisor, Bradley, and one of her subordinates, Morrin, in violation of Great Eastern's discrimination and harassment policy. Clevenger Dep. at 15:12-21; Clevenger Dep. Ex. 3. Kent and Nichols did not know Ferrell filed the August human resources complaint until this litigation began. Kent Dep. at 46:14-19; Nichols Dep. at 103:22-104:4. Bradley knew Ferrell filed a complaint about his demotion, but she did not know the particulars of the complaint. Bradley Dep. at 43:11-19, 44:2-13, 70:5-11. In September 2012, Ferrell filed a sexual discrimination charge with the EEOC. Kent Dep. at 32:12-18; Clevenger Dep. Ex. 7. Neither Bradley, Kent, nor Nichols was aware that Ferrell filed the September EEOC complaint until this litigation began. Bradley Dep. at 137:3-8; Kent Dep. at 57:12-58:9; Nichols Dep. at 104:11-20.

Bradley admits to being in a romantic relationship with Morrin at the time she demoted Ferrell. Bradley Dep. at 34:16-25. After Ferrell filed his complaint with human resources, Clevenger confirmed Bradley was in a relationship with Morrin and that she recommended Ferrell for demotion based on his TO numbers. Clevenger Dep. at 144:2-11. Clevenger also confirmed with Kent that he had asked the line directors to demote one TO manager from their teams based on the criteria the line directors chose and confirmed how the final demotion decisions were made. Id. at 163:23-164:13; Clevenger Dep. Ex.21. The EEOC also investigated the claim, was "unable to conclude that the information obtained establishe[d] violations" of Title VII, and closed the file. Ferrell Dep. Ex. 9 at *1.

5

In October 2012, Great Eastern began preparing for its seasonal reduction in staff. Nichols received a communication from Great Eastern's head of marketing that front line sales staff needed to be reduced to fifty-five sales representatives. Nichols Dep. at 27:2-13. Rather than cut staff down to fifty-five immediately, Kent and Nichols decided to initially cut the sales staff down to sixty-five representatives to account for the anticipated increase in tourism associated with the fall foliage. Id. at 28:14-29:1, 31:13-32:23. Kent terminated or transferred eleven sales employees from the front line, including one TO manager, Morrin, who was demoted to sales representative and transferred to the in-house sales line. Kent transferred Morrin rather than terminating him in order to give him a second chance to increase his sales numbers. Kent Dep. 71:9-16, Ex. 2 at *GERC 6085.[2] No employment action was taken as to Ferrell in October.

As November drew to a close, Great Eastern decided to make the final round of cuts to the frontline sales staff. Using a November 26, 2012, year-to-date sales report, Kent and Nichols selected Steve Ferrell along with eight other members of the front line sales staff for termination. One of those individuals was a TO manager who had the lowest VPG out of all of the sales staff. Nichols Dep. Ex. 2. Kent and Nichols ranked the sales staff according to VPG and retained the top fifty-eight members of the sales staff. With the exception of the TO manager with the lowest VPG out of all of the sales staff, Kent and Nichols did not consider the other TO managers for that seasonal termination because TO managers are judged on other criteria along with VPG. Kent Dep. at 103:23-104:10; Nichols Dep. at 57:1-59:11.

After deciding who to terminate, Nichols sent an e-mail to Vickie Ruiz ("Ruiz"), Human Resources Director for the Berkley Group, to inform her of the selections. Nichols Dep. Ex. 2 at

---

[2] Clevenger testified that the Human Resources Director for the Berkley Group, Vickie Ruiz, made the decision to transfer Morrin because "it would be best to send [Morrin] up to in-house . . . he needed to be separated from Bradley." But Morrin's "Change of Employment Form" clearly states the transfer and demotion were "per Bob Kent" and because of "Poor Production – Given another chance at Inhouse." Compare Clevenger Dep. at 166:19-167:16 with Kent Dep. Ex. 2 at *GERC 6085. Moreover, Nichols testified that Kent would make decisions as to who should be terminated or transferred then those choices would be forwarded to Human Resources at the Berkley Group for final approval. See Nichols Dep. at 48:1-50:7.

*GERC 6019. Ruiz and Nichols spoke on the telephone, and she requested the reports Nichols and Kent used in order to confirm the grounds for the terminations. Nichols Dep. at 44:8- 45:15. Nichols sent Ruiz another e-mail that included the last page of the year-to-date sales report for November 26, 2012. Nichols Dep. Ex. 3. Ferrell and the other sales staff were terminated on December 2, 2012. Nichols Dep. Ex. 5.

Soon after he was fired, Ferrell filed a human resources complaint with Clevenger alleging his termination was in retaliation for his filing the August human resources complaint and September EEOC complaint. Ferrell Dep. Ex.15 at *FERRELL 12. Ferrell filed another EEOC complaint regarding his termination shortly thereafter. Ferrell Dep. Ex. 15 at *FERRELL 8. Neither Bradley, Nichols, nor Kent were aware that Ferrell filed the December human resources complaint or EEOC complaint until this litigation began. Kent Dep. at 58:10-59:3; Bradley Dep. at 137:9-138:12; Nichols Dep. at 105:11-106:7. Ferrell attempted to apply for a sales position on the in-house line in July 2013. Ferrell Dep. at 181:16-19; Clevenger Dep. at 69:20-70:8. In August, Ferrell discovered he was not eligible for the position on the in-house line because he had been designated as "not for rehire" in his employee file. Ferrell Dep. at 197:21-198:2; Clevenger Dep. at 70:23-71:8.

Clevenger marked Ferrell's employment file as ineligible for rehire after Ferrell's termination. Clevenger Dep. at 135:2-23; Clevenger Dep. Ex. 8; Bradley Dep. at 117:1-119:6. Clevenger marked Ferrell as not eligible for rehire because he

> had received about eight HR complaints of intimidation, threatening behavior, comments. [Ferrell] was not – you know, [Ferrell] was not following the TO rules. And all this happened and it was – I mean, you know, looking back, people say, you know, [Ferrell] was just kind of freaking people out. But it was not that. It was – [Ferrell] was – people were terrified. People didn't want to come to work. People were always worried about where [Ferrell] was. And I observed the behavior myself in meetings with Mr. Ferrell. I did not want to ever have to deal with that again for people that worked there and myself. So he was put on the not-for-rehire list for those behaviors.

7

Id. at 129:9-23; see also Clevenger Dep. Ex.6, Ex.23. Ruiz approved Clevenger's decision to mark Ferrell as ineligible for rehire. Id. at 268:8-269:3.

## II.

Pursuant to Federal Rule of Civil Procedure 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Glynn v. EDO Corp., 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . [any] affidavits" filed by the parties. Celotex, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. (citation omitted). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the non-moving party. Glynn, 710 F.3d at 213 (citing Bonds v. Leavitt, 629 F.3d 369, 380 (4th Cir. 2011)). Indeed, "[i]t is an 'axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [her] favor.'" McAirlaids, Inc. v. Kimberly-Clark Corp., No. 13-2044, 2014 WL 2871492, at *1 (4th Cir. June 25, 2014) (internal alteration omitted) (citing Tolan v. Cotton, 134 S Ct. 1861, 1863 (2014) (per curiam)). Moreover, "[c]redibility

8

determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ." Anderson, 477 U.S. at 255. However, the non-moving party "must set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" Glynn, 710 F.3d at 213 (quoting Anderson, 477 U.S. at 252). Instead, the non-moving party must show that "there is sufficient evidence favoring the non[-]moving party for a jury to return a verdict for that party." Res. Bankshares Corp. v. St. Paul Mercury Ins. Co., 407 F.3d 631, 635 (4th Cir. 2005) (quoting Anderson, 477 U.S. at 249). "In other words, to grant summary judgment the Court must determine that no reasonable jury could find for the non[-]moving party on the evidence before it." Moss v. Parks Corp., 985 F.2d 736, 738 (4th Cir. 1993) (citing Perini Corp. v. Perini Const., Inc., 915 F.2d 121, 124 (4th Cir. 1990)).

## III.

Great Eastern moves for summary judgment on two grounds. First, Great Eastern argues that Ferrell fails to establish a prima facie retaliation claim because there is no evidence that the decision makers responsible for his termination knew of the protected activity at the time of their alleged retaliatory actions. Second, Great Eastern argues that Ferrell failed to exhaust his administrative remedies as to the alleged "schemes to depress his compensation" and the designation of Ferrell as ineligible for rehire. In the alternative, Great Eastern claims it had legitimate, nondiscriminatory, and irrefutable reasons for terminating Ferrell and designating him as ineligible for rehire. Ferrell moves for partial summary judgment that he engaged in protected activity, he exhausted his administrative remedies, there was a causal link between the protected activity and Ferrell's termination, and Great Eastern did not have a legitimate reason for terminating Ferrell.

The decisions to terminate Ferrell and designate him ineligible for rehire were made by separate individuals. Kent and Nichols were responsible for the termination decision, but Clevenger

9

was responsible for designating Ferrell as "not for rehire." Therefore, the court will first address Ferrell's termination and then address his ineligibility for rehire.

## A.

To establish a prima facie case of retaliation under Title VII, a plaintiff must prove three elements: "(1) that [he] engaged in a protected activity; (2) that [his] employer took an adverse employment action against [him]; and (3) that there was a causal link between the two events." E.E.O.C. v. Navy Fed. Credit Union, 424 F.3d 397, 405-06 (4th Cir. 2005). "Protected activity under Title VII is divided into two categories, opposition and participation." Laughlin v. Metro Washington Airports Auth., 149 F.3d 253, 257 (4th Cir.1998). The statute provides in pertinent part:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter . . . or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e–3(a). In short, "[a]n employer may not retaliate against an employee for participating in an ongoing investigation or proceeding under Title VII, nor may the employer take adverse employment action against an employee for opposing discriminatory practices in the workplace." Laughlin, 149 F.3d at 259. Participation includes "(1) making a charge [with the EEOC]; (2) testifying; (3) assisting; or (4) participating in any manner in an investigation, proceeding, or hearing under Title VII." Id. (citing 42 U.S.C. § 2000e–3(a)). "Opposition activity encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." Id. (citing Armstrong v. Index Journal Co., 647 F.2d 441, 448 (4th Cir.1981)).

The Supreme Court of the United States recently addressed the causation standard for Title VII retaliation claims in Univ. of Tex. Sw. Med. Center v. Nassar, 133 S. Ct. 2517 (2013). There the Court held that "Title VII retaliation claims require proof that the desire to retaliate was the but-for

10

cause of the challenged employment action." Id. at 2528 (citing Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 176 (2009). Thus, in order to prevail, Ferrell must put forth "proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." Id. at 2533.

If a plaintiff establishes a prima facie case, "the employer may rebut it by presenting evidence of a legitimate, non-retaliatory reason for the adverse action." Johnson v. Mechanics & Farmers Bank, NO. 07-1725, 309 F. App'x 675, 684, 2009 WL 188077, at *8 (4th Cir. Jan. 23, 2009) (citing Williams v. Cerberonics, Inc., 871 F.2d 452, 457 (4th Cir. 1989)). If the employer is able to present "evidence of its legitimate, non-retaliatory reason, the burden shifts back to the employee to show that the employer's proffered reason is pretextual." Id. To show pretext, the employee must prove "'both that the reason was false and that discrimination was the real reason for the challenged conduct.'" Holland v. Washington homes, Inc., 487 F.3d 208, 218 (4th Cir. 2007) (quoting Beall v. Abbott Labs., 130 F3d 614, 619 (4th Cir. 1997)).

In light of that analytical framework, Ferrell's claim fails to produce sufficient proof to meet the causation standard for a retaliatory discharge claim under Title VII and fails to show his designation as ineligible for rehire was pretextual. First, the decision-makers responsible for Ferrell's termination were unaware of Ferrell's protected activity. Second, the evidence presented in this case shows Great Eastern designated Ferrell as ineligible for rehire for a legitimate, non-discriminatory reason, and Ferrell fails to rebut that reason with evidence of pretext.

## B.

Because the decision-makers responsible for terminating Ferrell were unaware of his protected activity, Ferrell's retaliation claim as to his termination is without merit. An employer must be aware of an employee's protected activity before it can retaliate against it. See Baqir v. Principi, 434 F.3d 733, 748 (4th Cir. 2006); Hooven-Lewis v. Caldera, 249 F.3d 259, 273 (4th Cir. 2001);

11

Williams, 871 F.2d 452, 457 (4th Cir. 1989); Armstrong, 647 F.2d at 448. In this context, "employer" means the "decision-maker" behind the alleged retaliatory conduct. Dowe v. Total Action Against Poverty, 145 F.3d 653, 657 (4th Cir. 1998). In essence, if the "relevant official" was unaware of the protected activity at the time of the alleged retaliation, there can be no causal link between the two events. See Baqir, 434 F.3d at 748.

In Baqir, a plaintiff alleged his employer terminated him in retaliation for contacting an EEOC counselor and filing an administrative complaint. Id. at 740. The Fourth Circuit affirmed the district court's granting of summary judgment for the defendant for two reasons. First, most of the alleged retaliatory conduct occurred prior to that plaintiff's consultation with the EEOC. Id. at 748. Second, there was no evidence that the decision-maker was aware of the administrative complaint at the time of the alleged retaliatory conduct in that case. Id. In Causey v. Balog, the Fourth Circuit affirmed a district court's granting of summary judgment for the defendant as to the plaintiff's retaliatory harassment claim because there was no evidence that the alleged harasser knew of the plaintiff's EEOC charges. Causey v. Balog, 162 F.3d 803-04 (4th Cir. 1998).

In Thomas v. Potter, a plaintiff filed a retaliatory discharge claim, and the court granted summary judgment for the defendant. Thomas v. Potter, No. 1:06cv377, 2006 WL 2850623, at *4 (E.D. Va. Oct. 3, 2006). The defendant in Thomas filed an "affidavit denying any knowledge of [plaintiff's] prior EEO activity" at the time of the alleged retaliatory conduct, and the plaintiff provided no evidence to contradict the defendant's affidavit. Id. That plaintiff's "mere assertion, without more, that [defendant] did have such knowledge" did not create an issue of material fact. Id.

Other circuit courts of appeals agree it is fundamental that the decision-maker must be aware of the prior discrimination complaint for there to be a prima facie retaliation claim. In Luckie v. Ameritech Corp., 389 F.3d 708 (7th Cir. 2004), a plaintiff filed a Title VII retaliation claim against her employer, and the district court granted summary judgment for the employer. Id. at 711. In that

12

case, the plaintiff filed a racial discrimination complaint with the company's EEO representative. Id. at 712. The EEO representative testified she did not discuss the plaintiff's discrimination complaint with the decision-maker, the decision-maker claimed to have no knowledge of the discrimination complaint, the defendant corporation's policy was to keep discrimination claims confidential, and plaintiff produced no evidence to refute the EEO representative's testimony or the decision maker's testimony. Id. at 715; see also Grizzle v. Travelers Health Network, Inc., 14 F.3d 261, 267 (5th Cir. 1994) (plaintiff produced no evidence other employees brought discrimination complaints to plaintiff's superior's attention leaving only "impermissible speculation" that termination was causally connected to complaints.); Talley v. U.S. Postal Service, 720 F.2d 505, 508 (8th Cir. 1983) (plaintiff's retaliatory discharge claim lacked merit where undisputed testimony showed decision maker had no knowledge of plaintiff's "prior Title VII activities.")

In this case, no reasonable juror could conclude that the decision-makers responsible for Ferrell's termination were aware of Ferrell's protected activity. Kent and Nichols both testified that they were unaware of both the internal human resources complaint about Ferrell's demotion and the corresponding EEOC charge. Kent Dep. at 46:14-19, 57:12-58:9; Nichols Dep. at 103:22-104:4, 104:11-20. Additionally, even assuming Bradley played any role in the actual decision to terminate Ferrell—a notion completely unsupported by the record—she was not aware of the EEOC complaint and only knew that Ferrell had filed a human resources complaint regarding his demotion. However, she had no knowledge of the specifics of his complaint. Bradley Dep. at 43:11-19, 44:2-13, 70:5-11, 137:3-8. This testimony flatly refutes Ferrell's allegation that the decision-makers were aware of Ferrell's EEOC charge "no later than October 7, 2012." Pl.'s Mem. Supp. Summ. J., Dkt. No 81, at *26.

Ferrell presents absolutely no evidence to create a genuine issue of material fact on this issue. Defense counsel specifically asked Ferrell in his deposition:

13

Q: How do you know Rebecca Bradley knew you filed a charge with the EEOC?

A: I don't know that she did, other than the fact that she had my personnel file at home. I'm sure she – I assumed, maybe wrongfully, that she was privy to all conversations Mr. Clevenger and I had.

Q: Who else was pissed because you filed a charge?

A: Well, if it was public knowledge, then I would imagine [Kent] and [Nichols] were as well.

Q: I don't want you to imagine. I want to know what comments that you heard that reflect –

. . . .

A: As previously stated, I overheard no such comments.

Ferrell Dep. at 172:4-24. Indeed, Ferrell improperly relies on mere speculation and assumptions to conclude Kent and Nichols were aware of the September EEOC complaint. Additionally, it was Great Eastern's policy not to divulge information about human resources complaints or EEOC complaints to anyone outside the human resources department. Nichols Dep. at 103:22-104:4, 106:2-7; Clevenger Dep. at 171:16-19; Ruiz Aff., Dkt. No. 79-2, at ¶¶ 7-8.

Relying on the Fourth Circuit's decision in King v. Rumsfeld, Ferrell argues that the temporal proximity and context of Ferrell's termination are enough to establish a claim for retaliation in this case. Because his termination occurred a little over two months after filing his EEOC complaint, Ferrell argues this length of time is sufficient to establish a causal connection. Pl.'s Mem. Supp. Summ. J., Dkt. No. 81, at *25. The facts in King, however, are distinguishable from those here. In King, one of the plaintiff's supervisors received notice of the plaintiff's Equal Employment Opportunity complaint against him. King v. Rumsfeld, 328 F.3d 145, 148 (4th Cir. 2003). The temporal proximity of the plaintiff's termination provided "a sufficient inference of causation to satisfy the prima facie requirement" because the supervisor had notice of the complaint in that case. Id. at 151, 151 n.5. The decision-makers here, however, had no notice of the complaint

14

at the time of the alleged retaliatory action. Therefore, the temporal proximity alone cannot provide a sufficient inference of causation here. See Staley v. Gruenberg, 575 Fed. App'x 153, 156 (4th Cir. 2014) (unpublished per curiam opinion) (citing Hernandez v. Yellow Transp., Inc., 670 F.3d 644, 660 (5th Cir. 2012),cert. denied, 133 S.Ct. 136 (2012)).

Furthermore, while not dispositive of the issue, the fact that Great Eastern did not terminate Ferrell during the October 2012 reduction of staff is compelling that his termination was not in response to his September 2012 EEOC complaint. Rather, the record supports Great Eastern's proffered reason for terminating Ferrell: his "poor production" decreasing his VPG. For instance, according to the August 4, 2012 year-to-date ("YTD") VPG sales report for the front-line sales staff, Ferrell's VPG was 1931.77. Bradley Dep. Ex. 13 at *GERC 1550-51. According to the August 26, 2012, YTD VPG report, Ferrell's VPG dropped to 1804.00. Bradley Dep. Ex. 17 at *GERC 1485-86. On October 7, 2012, Ferrell's YTD VPG was 1777.66. Id. at *GERC 1497-98. On November 3, 2012, his YTD VPG was 1734.84. Bradley Dep. Ex. 7 at *GERC 1513-14. By November 26, 2012, the day Kent and Nichols decided to terminate Ferrell, his YTD VPG had dropped to 1682.71. Nichols Dep. Ex. 4 at *GERC 1421-22. In fact, the vice president of marketing requested that Kent and Nichols reduce the front-line sales staff to fifty-five representatives in October 2012. Nichols Dep. Ex. 1 at *GERC 6023. To account for staff vacations and the expected increase in tourism due to the fall foliage season, however, Kent and Nichols decided to initially cut down to sixty-five in October then make another staff cut thereafter. Nichols Dep. at 31:15-32:24.[3]

Considering the evidence in the light most favorable to Ferrell, his retaliation claim as to his termination is without merit. There is no dispute that the relevant officials, Kent and Nichols, were unaware of Ferrell's protected activity when they decided to fire him. Therefore, Ferrell fails to show

---

[3] Notably, if Kent and Nichols had cut the front-line sales staff down to fifty-five in October, Ferrell would have been cut based on his YTD VPG on October 7, 2012. See Kent Dep. Ex. 2 at *GERC 6093.

15

a sufficient causal link to make out a prima facie case of retaliation under Title VII for his termination.

**C.**

Clevenger was aware that Ferrell filed a complaint with the EEOC, and he made the determination to designate Ferrell as ineligible for rehire. Clevenger Dep. at 34:11-35:4, 135:2-23.[4] Therefore, there is a sufficient causal connection between his "not for rehire" designation and his protected activity. Thus, Great Eastern bears the burden of showing a legitimate, non-retaliatory motive for designating Ferrell as ineligible for rehire. See Johnson 309 F. App'x at 684, 2009 WL 188077, at *8. If Great Eastern meets its burden, Ferrell may overcome it with evidence that Great Eastern's decision was pretextual. Id.

Clevenger placed Ferrell on the "not for rehire" list because of numerous complaints he received from co-workers about Ferrell's behavior. Clevenger Dep. at 129:9-23. Multiple employees complained of Ferrell's threatening, intimidating or otherwise inappropriate behavior in the workplace. Clevenger Dep. Ex. 23. At least one sales representative and one TO manager complained to Clevenger that Ferrell's behavior caused front-line sales to suffer. Clevenger Dep. Ex. 23 at *GERC 1581, *GERC 1590. Clevenger reported these complaints to Ruiz. Ruiz Aff., Dkt. No. 79-2, at ¶ 9; Clevenger Aff., Dkt. No. 79-4, at ¶ 12; Clevenger Dep. at 222:18-223:22. Both Clevenger and Ruiz agreed Ferrell's behavior was an adequate reason to designate him as ineligible for rehire by the company. Ruiz Aff., Dkt. No. 79-2, at ¶ 10; Clevenger Aff., Dkt. No. 79-4, at ¶ 13; Clevenger Dep. at 34:22-35:4, 268:8-269:3. That proffered reason is clearly not discriminatory on its face, and it is not the province of the court "to decide whether the reason was wise, fair, or even

---

[4] Both parties moved for summary judgment as to whether Ferrell exhausted his administrative remedies before bringing the ineligible for rehire aspect of his retaliation claim. Because the "similarities between [Ferrell's] administrative and judicial narratives make clear that [Great Eastern] was afforded ample notice of the allegations against it," the court will address the ineligible for rehire decision on the merits. See Sydnor v. Fairfax Cnty., Va., 681 F.3d 591, 595 (4th Cir. 2012).

correct, ultimately, so long as it was truly the reason for the plaintiff's termination." DeJarnette v. Corning Inc., 133 F.3d 293, 299 (4th Cir. 1998).

In order to show Great Eastern's decision was pretextual, Ferrell must show that Great Eastern's reason was both "false and that discrimination was the real reason for the challenged conduct." Holland, 487 F.3d at 218. However, Ferrell does not direct the court to any "probative evidence of discriminatory animus" in support of his pretext argument. Cupples v. AmSan, LLC, 282 Fed. App'x 205, 210 (4th Cir. 2008). Ferrell asserts that the employee complaints were false, provides one declaration to support that claim and relies on the fact that his change of employment form bears no indication that he was intimidating co-workers or disrupting the workplace. Ferrell's pretext argument is entirely speculative and not supported by evidence.

First, the statements in the declaration are not corroborated by anything in the record. Nicole Jones ("Jones"), a former Great Eastern employee, declares Bradley made derogatory comments about Ferrell and forced Jones to make false statements about Ferrell. Dec. of Nicole Jones, Dkt. No. 102-9, at ¶¶ 7-13. Jones also stated that Clevenger asked her leading questions that reflected negatively on Ferrell, and that she did not write a letter complaining about Ferrell that purported to be written by Jones. Id. at ¶¶ 14-30, 34-35, Ex. A. Jones "believes" her co-workers, Jen Strickler ("Strickler") and Wanda Parcell ("Parcell") were also forced to make false statements about Ferrell. Id. at ¶¶ 14, 30.

During her deposition, Bradley responded to questions about her interaction with Jones after Ferrell's demotion. Bradley specifically testified:

> Q:    Who else did you talk to?
>
> A:    Nicole Jones.
>
>                        . . . .
>
> Q:    What did you tell Ms. Jones to do?

> A:    I told her if she felt uncomfortable, she needed to go talk to David Clevenger.
>
> Q:    Did you have Ms. Jones write some stuff down for you?
>
> A:    No.
>
> Q    You didn't have her write anything about Mr. Ferrell out for you?
>
> A:    [Clevenger] did that with her. I didn't.
>
> Q:    All right. Did you talk to Mr. Clevenger about these people coming to see him before they went and saw him?
>
> A:    I went back and told them – or him that Nicki Jones would like to talk to him, and he would say "okay."
>
>                          . . . .
>
> Q:    All right. And you did not have Nicki Jones write anything down for you?
>
> A:    No.

Bradley Dep. at 125:24-128:13.

In addition, both Strickler and Parcell were deposed in this matter and their testimony clearly shows that Jones' declarations as to them are based on nothing but speculation. Parcell stated "[Ferrell] was starting to make me feel very uncomfortable at work, and I wanted him to leave me alone at work. That's when I initiated the complaint against him with all the questioning." Parcell Dep. at 51:5-7. Parcell elaborated

> he was continuously questioning me about [Bradley], about Morrin, about numbers, about this person, about that person, and I didn't like him questioning me all the time. So I asked him very nicely before I filed the complaint to please stop asking me questions at work. I had – he made me very uncomfortable.

Id. at 52:12-18. Parcell spoke to Bradley about her concerns regarding Ferrell:

> Q:    Did you have a conversation with Ms. Bradley about Mr. Ferrell?
>
> A:    Yes.
>
>                          . . . .

18

> A:      [Bradley] came to me and told me that someone had c[o]me
>         to her out of concern and was Steve Ferrell bothering me.
>         And I told [Bradley] that [Ferrell] was making me feel
>         uncomfortable, and it was starting to get a little out of hand.
>         And [Bradley] said, Well, human resources is here. If you
>         need me, if you need anybody, we're here for you.
>
>                                    . . . .
>
> A:      . . . [I]t went on for about another week before I went to
>         Clevenger.

Id. at 66:10-25. Parcell met with Clevenger in early September and "told him about what Steve
Ferrell was doing and how – I told [Clevenger], I said, It's getting to the point where I don't want to
even come to work in the morning because I don't want to deal with the negativity." Id. at 68:18-22.
Parcell filed a formal, written complaint about Ferrell with Clevenger and wrote the complaint
outside of Clevenger's presence. Id. at 72:5-24 Parcell also signed a declaration in this case directly
refuting Jones' allegations that Parcell felt coerced into making false statements about Ferrell. See
Dkt. No. 110-1.[5]

Strickler testified during her deposition about an incident involving Ferrell that caused her to
break down in tears. Strickler Dep. at 17:19-20-25. Strickler went to talk to Clevenger and told him
"how angry [Ferrell's actions] made me feel and how uncomfortable it made me feel. . . .[I]t was
more like it was aggravating. It was – it was intimidating and aggravating, and it made me mad." Id.
at 23:22-24:2. While Strickler's memory of the events in 2012 was less clear than Parcell's she did
remember giving Clevenger a statement, and, after receiving a copy of a written statement, she
remembered writing the statement about Ferrell as well. Id. at 46:11-21, Ex. 1.

Jones' declaration is not supported by any evidence in this case, and her speculation does not
establish a genuine issue of material fact as to the motive for Ferrell's designation as ineligible for
rehire. Furthermore, nothing in Jones' declaration creates an issue of fact that at least Strickler,

---

[5] Clevenger submitted an affidavit refuting Jones' declaration as well. See Clevenger Aff., Dkt. No. 116.

19

Parcell, and several other employees felt uncomfortable in Ferrell's presence and complained about his behavior. Therefore, Jones' declaration standing on its own does not create a triable question for the jury that Great Eastern's proffered reason was false.

Ferrell argues that his change of employment form does not mention anything about threatening or intimidating behavior. That argument also fails to establish an issue as to pretext. Clevenger and Bradley both testified about the change of employment form. Bradley marked the box labeled "TERMED" to indicate Ferrell's termination, and in the "Reason for Change" section, Bradley wrote "at will." Bradley Dep. at 108:19-109:8, Ex. 19. Bradley did not write "poor production" or check the box designating Ferrell as ineligible for rehire. Id. at 117:1-119:6. Clevenger clarified Bradley's testimony. Early in his deposition, Clevenger answered affirmatively that Ferrell's change of employment form "says that Mr. Ferrell was terminated, not eligible for rehire, because of at will, poor production[.]" Clevenger Dep. at 39:13-17. Later on, Clevenger gave more specifics about the form. Clevenger explained that the reference to "poor production" on the form had nothing to do with Ferrell being marked ineligible for rehire. Id. at 131:6-9. According to Clevenger, he designated Ferrell as "not for rehire" because he

> received about eight HR complaints of intimidation, threatening behavior, comments. . . . Ferrell] was not following the TO rules. . . . [Ferrell] was just kind of freaking people out. . . . [P]eople were terrified. People didn't want to come to work. People were always worried about where [Ferrell] was. And I observed the behavior myself in meetings with Mr. Ferrell. I did not want to ever have to deal with that again for people that worked there and myself. So he was put on the not-for-rehire list for those behaviors.

Id. at 129:9-23. Clevenger explained further:

> Q:   My question is, if that's the case, why didn't you reference those reasons in the Additional Comments on that form?
>
> A:   I didn't think it was necessary.
>
> Q:   Why would you not think that was necessary?

20

A:     I had a – well, I don't know what I thought at the time; I just
       knew it wasn't necessary because what happened happened.
       Regardless of whether I wrote it on this form, it happened.

                              . . . .

A:     . . . [I]n some cases I have it on the form; it covers the reason
       why they were terminated and the reason why they were put
       not for rehire. A lot of times those reasons are the same. In
       this case it was not.

Id. at 131:10-133:5. Ferrell's claim that Bradley made the decision to mark him as ineligible for

rehire, Pl.'s Mem. Supp. Summ. J., Dkt. No. 81, at *40, bears no evidentiary support in light of

Clevenger's plain, repeated statements that he made the decision to designate Ferrell as "not for

rehire." See id. at 135:2-23, 136:13-137:3. In light of Clevenger's testimony, no reasonable juror

could conclude that Great Eastern's proffered reason was false simply because Ferrell's employment

form lacks a reason for his designation as ineligible for rehire.

       Finally, simply because Great Eastern did not take any immediate disciplinary action against

Ferrell with regard to the employee complaints does not make the complaints or Great Eastern's

reason for marking Ferrell ineligible for rehire false. It is not the court's role to act as a "'super-

personnel department weighing the prudence of employment decisions made by firms charged with

employment discrimination.'" Cupples, 282 Fed. App'x at 210 (quoting DeJarnette, 133 F.3d at 299).

Ferrell's reliance on Great Eastern's failure to discipline him does not create an issue of fact as to the

validity of its reason for quashing Ferrell's eligibility to be rehired.

       In the retaliation context, it is the "perception of the decision[-]maker which is relevant not

the self-assessment of the plaintiff," and no reasonable juror could conclude that Great Eastern's

"proffered explanation is unworthy of credence." Holland, 487 F.3d at 218 (internal quotations

omitted). There is no issue of material fact that Clevenger and Ruiz agreed to designate Ferrell as

ineligible for rehire for a legitimate, non-retaliatory reason—the disruption his presence caused in

the workplace. See Clevenger Dep. at 268:8-269:3. Ferrell fails to put forth evidence that Great

Eastern's reason was both false and discrimination was the real reason for its action. No reasonable juror could conclude that Great Eastern's proffered reason for listing Ferrell as "not for rehire" was pretextual. Thus, Ferrell's retaliation claim regarding his designation as ineligible for rehire fails.

IV.

In sum, Ferrell fails to make out a prima facie case of retaliation for his termination from Great Eastern because the decision-makers responsible for his termination had no knowledge of his human resources or EEOC complaints. Additionally, Ferrell fails to show that Great Eastern's reason for designating him as ineligible for rehire was pretextual. Because there is no genuine issue of material fact as to either of these issues, Great Eastern is entitled to judgment as a matter of law. An appropriate Order will be entered this day.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

Entered: November 12, 2014

/s/ Michael F. Urbanski

Michael F. Urbanski
United States District Judge

22